Looks like we have everyone here who should be for the next case which is Hetronic International v. Hetronic Germany GmbH. Docket 20-6057. We have a full docket this morning and so we're holding pretty tight to our timelines. With that in mind, Mr. Steiner, when you're ready to proceed. Good morning, your honor, and may it please the court. The key issue in this case and on this appeal concerns the application of the Lanham Act to purely foreign commerce. The district court's application resulted in a worldwide injunction applying to all 195 countries in the world, even though none of the parties below had established rights in those 195 countries. And the district court's application of the Lanham Act also resulted in a 90 million plus verdict on Lanham Act damages on purely foreign sales. And this was based on a record below of sales by one of the six defendants. And again, your honor, these are all foreign citizens, Austrian and German citizens. The record of trial was one sale four years ago by Abitron Germany, totaling $5,160.94. That's at volume three, page 3061. Okay, so you're starting with the extraterritorial reach of the Lanham Act. Just for me, it'd be better if we first discuss jurisdiction in the sense of personal jurisdiction. Are you still challenging that your clients are not the alter ego of the companies who entered into the distribution agreements that had the choice of forum provision? Your honor, I think we're arguing it slightly differently. And so those two defendants are Abitron Germany and Abitron Austria. And the district court below found that they were successors in interest to companies, Abitron Germany and Abitron Austria system, who the latter of which had signed agreements that contained form selection clauses. Our argument is separate from the alter ego analysis, which we don't think the district court found in the successor analysis. Our argument is under the Oklahoma law that we've cited the Green Tree case that says if the underlying agreement that contains the form selection clause, I believe in that case it was an arbitration clause, it is unenforceable. And so the legal concept is if it's unenforceable against the original party to the agreement, how could it be enforceable against successors in interest? That's as to the two companies, your honor. As to Mr. Fuchs, who's an individual defendant from Austria and the holding company, which was not a seller of trademarks in this case, that's ABI holding. The argument is under 4K2, and we have two very short arguments. First, we believe that it was incumbent upon the district court to make a finding under 4K2 that if another jurisdiction under a nationwide analysis had appropriate contacts with either Mr. Fuchs or ABI holding, it was incumbent upon the district court to make that finding. In fact, there was evidence that two other jurisdictions, for example, Massachusetts and Las Vegas had such contacts, but they were disregarded in the analysis. But more importantly, we believe that it was an error that the district court did not make a finding as to how exercise of nationwide jurisdiction under 4K2 offends traditional notions of fair play and substantial justice under the Fifth Amendment that's not in the record. Let me interrupt you there. Neither party cited our case from last year Company de Inversions Mercantiles 973 F3 1282, where we said that the burden it would be on you to come forward and show evidence that there is another state where you have better contacts. And I don't see that you undertook that burden here. It's not the district court doesn't have a sua sponte obligation, according to our case from last year. Thank you, Your Honor. So I think that the way that I would respond to that is that we would have satisfied our burden by identifying those contacts in other jurisdictions. Then it was up to the district court to make the decision again. There were possible contacts within the state of Massachusetts that would have supported nationwide jurisdiction, and the same is true of Nevada. But that analysis was not undertaken. In fact, the existence of those contacts is in the briefing, Your Honor. But stop there. And the case that Judge McHugh is pointing you to, there's this sentence, a defendant who wants to preclude use of Rule 4K2 has only to name some other state in which the suit could proceed. You never did that. You're talking about contacts, but you never said we're subject to suit in Massachusetts or Nevada. So why don't you just lose on that? I suppose we do, Your Honor. I think that what we said is, is that Massachusetts and Nevada are appropriate, but to the extent we didn't stipulate, then I suppose that under this court's authority, then we do lose under that analysis. But I believe that we identified alternative jurisdictions wrong. May I continue? Please. Thank you. Cutting back just briefly to the extraterritorial application of the Lanham Act, again, it resulted in a worldwide injunction, and it resulted in $90 million of trademark damages on purely foreign sales on the record that I've already established. And the analysis of that application is sometimes characterized as a merits decision, sometimes characterized as a subject matter jurisdiction. But the key point here, Your Honors, is that the question, the key legal question with far-reaching ramifications was never decided. I'll address each under the merits first and then subject matter jurisdiction. Well, let me, the issue, as I understand it, is not whether there were sales in the U.S., but whether there was a substantial effect on United States commerce. Would you agree with that, that you can have a foreign sale that has a substantial effect on United States commerce? I think that the answer to that question, Your Honor, is very limited to the circumstance in what is called the Diversion of Sales Doctrine, which is narrowly applied. That's the Fourth Circuit case from Tire Engineering. And so what it says is, in effect, that the United States commerce is a narrowly applied doctrine. It's the Fourth Circuit case. It's Tire Engineering. That concept was repeated by the First Circuit in the McBee case. We don't have a legitimate interest in protecting foreign confusion. And so in the circumstance where a plaintiff cannot establish the lost sales in America that affect commerce, or the confusion in America of which the Lanham Act is concerned, there is a narrowly applied doctrine. It's the Fourth Circuit case. It's Tire Engineering. And the criticism of that case is, I think, respectfully mincing. And so Tire Engineering states that the courts that have reviewed the narrowly applied Diversion of Sales Doctrine have required the defendant to be a U.S. citizen because under and its progeny, it's very clear that the authority of Congress and the courts to govern the behavior of its own citizens is both broad and thorough. But when we are engaged in governing the behavior of purely foreign citizens, it is curtailed. That's the point of Tire Engineering. What plaintiff argued below was that Tire Engineering was badly reasoned because it proposition that the defendants must be U.S. citizens. Those cases are a Ninth Circuit case, Ocean Garden, and a Fifth Circuit case, American Rights. And so I suppose from a technical perspective, those cases don't hold as a requirement that the defendants be U.S. citizens. But what they do acknowledge is that both of the defendants in those cases were U.S. citizens. Let me ask you on the substantial impact on commerce. I'm a little bit confused because as I understand it in the summary judgment proceedings, you acknowledge that there had been over $200,000 worth of sales in the United States, but now you're contending that it's $16,000. Number one, do I have that mistaken? And number two, what explains the difference? I don't think you have it mistaken, Your Honor. So that's summary judgment. And so we've identified separately for purposes of this appeal is what was the record evidence on appeal? There was not record evidence of the trial of $200,000. Those sales were made by the defendant Hedtronic Germany. And incidentally, those sales were made to the plaintiff. If that evidence had come in trial, it would have been irrelevant to the Lanham Act claims under the total claim case from the Second Circuit because there's no possibility of confusion when the sales are made by the defendant who's alleged to infringe trademarks to the party claiming infringement. They don't count for Lanham Act purposes. But the answer to your question is those sales were not part of the trial record, Your Honor. What were you talking about those sales? Are those sales that were made in the United States or sales of products that ended up in the United States? Thank you, Your Honor. So the $200,000 question asked by Judge Phillips, those were sales that were made directly to the United States to the plaintiff. And under the total plan analysis, that's the Second Circuit case. Those don't count for Lanham Act analysis. What is the number in the record, the trial record, that indicates the dollar amount of products sold in foreign commerce that ended up in the United States? I'm sorry, Your Honor. I didn't quite hear it. I apologize. What is the dollar number of products that were sold in foreign countries that ended up in the United States? The trial record of that number is zero. There was no evidence presented to the jury on that topic. The only evidence was submitted by way of offer of proof, documentary offer of proof to the district court. You mean there is evidence, it was not accepted by the district court if they made a proffer? Is that what you're saying? So, Your Honor, I made the proffer for the defendants per the instructions of the district court by documents after evidence was closed below. And those documents indicate zero? No, no. I'm sorry, Your Honor. What does a proffer have to do with what the evidence in the record is of foreign sales whose products end up in the United States? So, the evidence that was produced by plaintiff on that topic is certainly zero. The evidence below, it was $1.7 million in sales that began in a foreign country, ended up in America, was only submitted by way of offer of proof. It was not permitted in evidence. May I continue? Let me ask this as to confusion. Was there any evidence of confusion in the United States? No, Your Honor, there was not. There was evidence of confusion in Europe, correct? There was evidence of confusion in Europe offered by the plaintiff. Why does it matter? Why does it matter where the confusion was? Confusion is confusion, isn't it? It matters because, as the cases say, this is true in the McBee case, this is true in the entire engineering case. The Lanham Act is not concerned. The United States laws are not concerned with confusion of Japanese consumers. It's not concerned with German consumers. The laws of those countries are what matter for purposes of foreign confusion, Your Honor. That's the narrow application of the diversion of sales. So you have a case, an authoritative case, that says that confusion in a foreign country does not amount to confusion under the Lanham Act. That's the entire engineering case, the Fourth Circuit, Your Honor. The same concept is announced in the first circuit. Same case that says that you have to have an American company as a defendant, correct? That's correct, Your Honor. And, Your Honor, I had intended to reserve two minutes. I think I'll just stop now and reserve what I have left. Very well. Thank you. Ms. Berman, when you're ready. Your Honor, may it please the Court, this is a compelling Lanham Act case. The defendants, who were our former licensees and distributors, schemed to, quote, attack Hatronic where it lives in the U.S., close quote, by competing against us, selling identical infringing products all over the world in the very same countries where Hatronic has exclusive distributors. This was a willful effort to infringe, right down to using our letterhead to tell customers that their products were still the same old Hatronic products, just a new name. They diverted millions of dollars of sales from us, including substantial amounts of infringing products that flowed back into the United States. Okay, let's stop there for a minute. According to your opponent, there's no evidence in the record that those infringing products ended up back in the United States. And I'm looking at my own records that indicate it's in Volume 12 at 3006, but I can't tell you from memory what I'm referring to there. Is there anything in the record? Yes, Your Honor, there is. Mr. White-Teller, who is one of defendants' own witnesses, testified at 2-SUP at 480-91 and 501-02. He was shown a stack of invoices that showed that they were being, even though they were sold abroad, that they were coming into the United States. And he testified, obviously, from the page numbers, quite at length about that. So it's simply not accurate that there's no testimony that foreign infringing sales made their way back to the United States. Moreover, our own client testified. Is there evidence of what the dollar amount is? Your Honor, not the specific amount as there was at summary judgment, but you can see the exhibits, which are part of the trial record, and you could add them up and it'd be quite voluminous. It was through 2017, it was almost $2 million. All right, so you're telling me that if I go and add up your invoices for some period of time, it will show that $2 million of product came from foreign countries into this country? Yes, Your Honor, at least almost $2 million just up through 2017. And what's the full period from 2015 to 2017? So, Your Honor, it started in 2014 when AviTron was launched in September of 2014. So September 2014 through December 2017, we didn't get updated financial records after that. So $2 million over three years? A minimum of that, yes, Your Honor. All right. Does the evidence indicate from this witness that the invoices you're talking about are merely exemplary rather than the total amount? I'm sorry, I didn't hear what you said, Your Honor. Does the record indicate is it these invoices you're talking about? Does the witness indicate whether or not the invoices are merely exemplary or they represent the total amount of product coming from foreign countries into this country? They were examples. And that's clear from what the witness said? Yes, Your Honor, they were given a stack of invoices because part of the problem is some invoices indicated they were being sent to the United States, but based on the testimony of other witnesses, that's the floor, not the ceiling of what may have come back. Generally, they sometimes indicate which country they end up in, but there's nothing that prohibits the person that buys the radio remote controls from ultimately sending them to the United States. Thank you. Thank you, Your Honor. And more importantly, they targeted and confused U.S. customers by having a distributor here in the United States and then exhibiting at trade shows here in the U.S. and abroad where they knew U.S. customers would be present. And I'm going to go through some of the specific U.S. confusion evidence in a minute. And they harmed Petronix's reputation, a U.S. company, when U.S. customers thought that their defective products were ours and were mad at us when we told them we couldn't fix them. All of this led Judge Friant to conclude in his permanent injunction ruling, quote, defendants have clear contact with and links to the U.S., close quote. And given these extensive contacts, Judge Friant continued, quote, any remaining qualms about extraterritorial application melt away, close quote. Defendants' primary argument below and on appeal and today is that none of their infringement and harm they cause is actionable because they are foreign. But the trial court rightly rejected that argument as a matter of law. Foreign defendants don't get a free pass under the Lanham Act when their infringement causes substantial harm in the United States. And that is precisely what happened here. Is there a direct authority that says you do not have to be an American company to be responsible for these Lanham Act violations? Yes, Your Honor. It starts with Vanity Fair and Timberlane, and then there's many, many cases decided after that. If you had to be a U.S. defendant, they wouldn't have the tests that they go through where that is an fact. It's a single factor that's considered. And there's examples of foreign defendants. Okay. You're telling me that in Vanity Fair, the defendant was a foreign company? Yes, Your Honor. It was Canadian. And in Timberlane, the defendant company was a foreign company, you're telling me? I believe so, Your Honor. And I can give you examples of foreign defendants being enjoined, including in the Trader Joe's case, which is a Ninth Circuit case. They weren't enjoined. They found that they could apply extraterritorial application over them. In the Davis case, the foreign defendant was enjoined. In the Bases case, the foreign defendant was enjoined. In Calvin Klein, the former... What are the cases were decided after tire engineering? I believe the Trader Joe... Did he criticize tire engineering or expressly reject it? So, Your Honor, tire engineering only... I think it's decided improperly, but it says if there's no U.S. confusion, it has to be a U.S. defendant. That case is inapposite for us because we have reams of U.S. confusion. I can give you some examples of it from the defendant's very own witnesses. Ms. Zirth, who was in their sales department, testified at length about how U.S. customers were asking for Hatronic products and were confused between Hatronic and Abitron. That's a two-sub app, 530 to 533. And in fact, when you tell... When you devise a plan, as the defendants did, to attack Hatronic where it lives in the U.S., it should come as no surprise to the defendants that that actually caused harm and confusion in the U.S. So, you're not... You are not relying upon likelihood of confusion in the U.S. You are citing evidence of actual confusion? Correct, Your Honor. All right. And how many instances of actual confusion in the U.S. are in the record, in the trial record? There are numerous. So, Ms. Zirth identified... You don't have to go through all... I don't want you to waste time telling me about each one. No, I'm just going to tell you about the other witnesses who testified about U.S. confusion, if that's okay with Your Honor. That's fine. Their own U.S. distributor, Mr. Roeders, testified about more examples of U.S. customer confusion. That's a three-sub app, 578 to 80. Mr. Polonsky, the owner of their U.S. distributor, testified that he himself was confused and he believed that the products were the same from the same company. He also testified that he interacted with customers who were also confused. That's at 13 app 3284 to 98. Mr. Scheurer testified at length about numerous examples of confusion, both in Europe and in the United States. And specifically with the United States, he testified about a company who took its Abitron-labeled product to Hatronic USA in Oklahoma for it to be repaired, even though it had not been purchased and was not a Hatronic product. That's at three-sub app 647. And Mr. Scheurer also testified about meeting with Emco, which is a U.S.-based company, and they expressed confusion, three-sub app 611 to 14. And Mr. Whiteler also testified about the U.S. trade show where Abitron products were exhibited to U.S. customers, and that he is waiting for this case to be over so he can return back and continue selling in the United States. We also had substantial testimony about trade shows in Europe where U.S. customers were present and were equally confused. In this case, we have a U.S. company that lost sales, U.S. customers who were confused, and the reputation of a U.S. company was harmed by customers thinking that they made defective infringing products. And the links to the United States are extensive. Hatronic Germany and HCEE had a contractual relationship with a U.S. company that was governed by U.S. law. The defendants hired Hatronic's former president located in the United States to assist them with their infringement. The defendants sought in the U.S. FCC licenses, which are only necessary to sell products in the United States, not any other country in the world, and they also obtained U.S. trademarks. It's the very same people in Abitron who were working for Hatronic Germany and HCEE as our foreign distributors. They hired a U.S. distributor. They sent people from Germany to train those, the U.S. distributor, and to conduct repairs. They exhibited at a U.S. trade show. At international trade shows with U.S. customers, they had a booth that looked very similar to Hatronic's. They sold products, as I mentioned earlier, that they knew were destined for the United States. And you've heard about the U.S. confusion. And because of all of that, the reputation of a U.S. company was harmed. And this is particularly critical in cases, and you'll see this in the Davis case and the Wernicke case and several others, where former foreign distributors then turn around and start competing and selling infringing products. It's not surprising that consumers are confused as to whose products they're buying, nor is it surprising that those efforts are diverting sales from the U.S. company because the consumers still believe that they are buying products from the same company. And that's what led Judge Friot to conclude that the evidence of diverted sales, it was very strong that the diverted sales that were made in Europe, even if they never came into the United States, could have been made by Hatronic, but for the defendant's infringement. As we explained in our brief, the overwhelming weight of authority recognized that the Lanham Act reaches these kinds of injuries. Therefore, we ask that you affirm Judge Friot's entry of the injunction as well as the damages award. Let me ask you a question on the injunction. Why is it not overbroad in reaching countries in which Hatronic is not currently marketing or selling these items? So, Your Honor, the evidence at trial was that Hatronic and the defendants sell in the exact same countries abroad, either directly through Hatronic or through exclusive distributors. So, the injunction covers territories where we've had diverted sales. So, it's not overly broad. Well, what if one of the companies goes to a new country that neither has been in before? The injunction covers that, as I understand it. Should it? So, if those sales in foreign countries where Hatronic is not currently still create confusion, either in the U.S., then possibly, yes, it should be covered. Defendants, obviously, if they're going to go into a new market where Hatronic isn't, if they think it's inappropriate, can seek relief under the injunction. But it's not just that we're not present there. There's other factors that go into substantial effect on U.S. commerce that would need to be considered. And I would defer that issue to the district court judge. Very well. Any further questions? All right. Thank you, Ms. Berman. Thank you. Mr. Steiner has some time remaining. Thank you, Your Honor. Very briefly, in opening the questionnaires, which was undecided. I'm having trouble hearing you. Can you get a little closer to your mic or something? Sorry. Can you hear me now? Yes. My apologies. The key question in this case has to do with whether or not the Lanham Act applies extraterritorially. And there's two lines of analysis. One is a merits analysis, which is contemplated by the Morrison Court and this court in Scoville opinion. And the other is the analysis that we've already discussed, which is substantial effect on commerce. I want to do the merits very briefly. Mr. Steiner, I think we understand that. I understood in your opening argument that you indicated that there was no evidence of actual confusion in the U.S. Did I misunderstand you? No, you did not. So there's two issues with that. The first issue is that the evidence cited is to... There's four different sources of evidence for confusion in the record. And so there is a sort of two categories. The first category is a general reference to possible confusion in which a customer is not named. I see that my time is out. May I continue? Yes, please do. Thank you. The other is identification of foreign witnesses. So when we name a customer, that's actual confusion. We're talking about three. A German company called HandConnect. I haven't said it correctly. That's the name, though. Mototok and Imco. Now, this wasn't our ability to cross-examine plaintiff's key witness on the topic, Mr. Scheuer, was stopped because the court didn't allow us to cross-examine him to demonstrate that that confusion occurred, if at all, in Europe and more specifically relating to German companies. And so that evidence was submitted by way of offer of proof after the trial, demonstrating that those customers and many others that were the subject of Mr. Scheuer's testimony for 47 minutes were no confusion in America at all. They were confusion in Europe. And we were not allowed to put on that testimony. We believe that was error as well. So you're telling me if I go to all of the record references that Ms. Berman made, I will find none that reflects actual confusion in the United States? I believe that's correct, Your Honor. And so there's four sources. The first is the court's order on injunction. That's the first citation. You answered my question. Understand that if I go look at those sites, it won't show actual confusion. Yeah, I don't believe it will, Your Honor. I think what it will do, subject to the fact that we didn't get to cross-examine Mr. Scheuer, but we submitted evidence after the fact. I understand the Scheuer cross-examination issue. Thank you. Thank you. I had only one other point, but I'm certainly out of time, Your Honors. No further questions. Then thank you both for your helpful arguments today. Case is submitted and counsel are excused.